# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-3327

_____

Curtis Pinson, Individually and as Husband

*Plaintiff - Appellant*

Cristi Pinson, Individually and as wife

*Plaintiff*

v.

45 Development, LLC

*Defendant - Appellee*

Brandrite Sign Company, Inc.; Citi Trends, Inc., doing business as Cititrends

*Defendant*s

Wausau Underwriters Insurance Company

*Intervenor Plaintiff*

_____

Appeal from United States District Court
for the Western District of Arkansas - Ft. Smith

_____

Submitted: June 12, 2014
Filed: July 11, 2014

_____

Before MURPHY, COLLOTON, and KELLY, Circuit Judges.
_____

MURPHY, Circuit Judge.

Curtis Pinson, a sign electrician, was installing a sign in a storefront canopy when he fell through the canopy and was injured. He subsequently sued 45 Development, the owner of the shopping center, and others. The district court[1] granted summary judgment to 45 Development, and Pinson appeals. We affirm.

45 Development owned and operated the Quarry Shopping Center in Fort Smith, Arkansas, and leased Suite 101B to Citi Trends, a clothing store chain. Curtis Pinson arrived at the shopping center on February 21, 2011 to install a lighted sign in front of the Citi Trends store. Citi Trends had initially hired Brandrite Sign Company to install signs at various locations but it later engaged two other companies due to the size of the job. One of these companies was Anchor Sign, Pinson's employer. Pinson, the crew leader, was a licensed master sign electrician and had had experience working with electrical signs for about ten years.

Pinson arrived at the job site with an Anchor Sign bucket truck and was accompanied by fellow employees Derrick Stewart and Sean Brown. Anchor Sign had conducted a site survey before Pinson and the others arrived. The location of the Citi Trends sign was in front of the store on the exterior of an entrance canopy above the sidewalk. The interior of the canopy did not have a floor; instead it had a base constructed of vinyl soffit material supported by a framework of metal joists. There was no access panel permitting entry into the canopy interior from below.

_____

[1] The Honorable P.K. Holmes III, Chief Judge, United States District Court for the Western District of Arkansas.

-2-

Pinson sought to gain access into the interior of the entrance canopy in order to install the sign. There is some dispute in the record as to how Pinson chose his method of proceeding. He asserted at the summary judgment stage that he had "informed his supervisor of the access problem, and was directed to go through the roof rather than the soffit in order to avoid damaging the owner's property." There is however no other evidence of such a conversation in the record. Tim Wilson, Anchor Sign installation manager and Pinson's supervisor, testified in his deposition that he would not have directed an employee to access a sign in an unsafe manner. Wilson also explained that the crew leader—"your experienced guy"—determines the best way to access and install a sign after reaching the site. Wilson testified that if Pinson had decided to create an access panel through the underside of the soffit in order to reach the canopy from below, he would have agreed with that approach. He also testified that protective harnesses were available on all Anchor Sign trucks and that Pinson could have obtained a different kind of ladder or a scissor lift by calling the company.

Pinson ultimately accessed the canopy from the store's roof by lowering a folded "A frame" step ladder into the entrance canopy. He testified in his deposition that he knew that the canopy material would not support a person's weight and therefore decided to place the ladder on the metal joists that formed the framework of the entrance canopy. A fellow crew member then held the ladder while Pinson climbed down into the canopy and placed a "two by six" wooden board from his truck underneath the ladder. The ladder was not secured; rather it was balanced on the loose board placed on top of the metal joists. As Pinson started to ascend the ladder, he thought the ladder "shifted." He instinctively stepped back, and then fell through the vinyl soffit to the sidewalk. He sustained injuries to his right foot in the fall, and states on appeal that these injuries later resulted in an unfortunate amputation of his leg from the knee down.

In July 2012 Pinson and his wife, Cristi Pinson, brought this action against 45 Development and others for various claims, including absolute liability and negligence. Pinson subsequently amended his complaint four times. In its November 2012 final scheduling order, the district court set a deadline of May 10, 2013 for leave to amend the pleadings. Pinson filed a fifth motion to amend his complaint on August 18, 2013 which was denied by the court on August 23. In the same order the court denied without prejudice eight motions by the plaintiffs for partial summary judgment and ordered their motions be consolidated into a single partial summary judgment motion. The Pinsons filed an amended motion for partial summary judgment on August 28. The district court then issued a memorandum order and opinion on September 23, granting 45 Development's previously filed summary judgment motion. Pinson now appeals, arguing that the district court erred by denying his fifth motion to amend his complaint, failing to hold that evidence of safety violations created an applicable standard of care, and granting summary judgment to 45 Development on the issue of negligence.

We conclude that the district court did not abuse its discretion in denying Pinson's fifth motion to amend his complaint. We review for abuse of discretion a district court's denial of leave to amend. Ray v. Am. Airlines, Inc., 609 F.3d 917, 926–27 (8th Cir. 2010). After the time has passed for amending pleadings as of right, parties may amend with the opposing party's written consent or the court's leave; the court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). District courts have authority to set deadlines for amendments and may determine "within broad limits" when exceptions are appropriate. Knoth v. Smith & Nephew Richards, 195 F.3d 355, 358 (8th Cir. 1999).

In its November 2012 final scheduling order, the district court set a deadline of May 10, 2013 for leave to amend pleadings. Pinson then filed a fifth motion to amend on August 18 over three months after the deadline, asserting that he sought leave to "focus his complaint, revise it to reflect newly discovered facts, . . . narrow down and eliminate certain issues" and add a new allegation relying on Arkansas law. On appeal

Pinson argues that his revision dropped several counts "and reframed [the complaint] to specify that OSHA and other consensus standards are evidence of negligence and nothing more." Pinson had already amended his complaint four times: twice as of right and twice with the district court's leave. The court denied the fifth motion on August 23, commenting that it was filed late without an explanation for its untimeliness and that its stated reasons were insufficient after discovery had closed and the deadline for amendments had passed. We conclude that the district court did not abuse its discretion in denying leave to amend when Pinson filed his motion over three months past the deadline. See Knoth, 195 F.3d at 358.

We review de novo a district court's grant of summary judgment. Argenyi v. Creighton Univ., 703 F.3d 441, 446 (8th Cir. 2013). We view the facts in the light most favorable to the nonmoving party, Curtis Pinson, and give him the "benefit of all reasonable inferences in the record." Id. Summary judgment is appropriate if there is "no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In this diversity case we apply Arkansas state law, and decisions of the Arkansas Supreme Court are controlling. Curtis Lumber Co., Inc. v. La. Pac. Corp., 618 F.3d 762, 771 (8th Cir. 2010). When the Arkansas Supreme Court has not ruled on an issue, we seek to predict how it would rule and may refer to intermediate state court precedent or other relevant sources as persuasive authority. Id. at 771–72.

To prove negligence Pinson must show that 45 Development owed him a duty, that it breached the duty, and that its breach was the proximate cause of his injuries. Yanmar Co., Ltd. v. Slater, 386 S.W.3d 439, 449 (Ark. 2012). Whether a particular duty is owed is always a question of law for the court. D.B. Griffin Warehouse, Inc. v. Sanders, 76 S.W.3d 254, 262 (Ark. 2002). Although 45 Development argues that the court should strike portions of Pinson's brief containing facts outside the record, that is not necessary since we will not consider any new evidence on appeal. See Davis v. Francis Howell Sch. Dist., 104 F.3d 204, 206 n.3 (8th Cir. 1997).

Pinson asserts here that he was a business invitee of 45 Development. A business invitee visits "for a purpose connected with the business dealings of the owner." Young v. Paxton, 873 S.W.2d 546, 549 (Ark. 1994). In Arkansas, a landowner generally does not owe a duty to a business invitee if a danger is known or obvious. Kuykendall v. Newgent, 504 S.W.2d 344, 345 (Ark. 1974). There is an exception to this obvious danger rule, however, and Pinson raises it. The Arkansas Supreme Court has described the obvious danger exception to apply "when the invitee is forced, as a practical matter, to encounter that danger in order to perform his or her job." Jenkins v. Int'l Paper Co., 887 S.W.2d 300, 304 (Ark. 1994). In Jenkins, the court referred to the Restatement's broader formulation of the obvious danger rule exception: that it applies when a landowner "as a reasonable person should anticipate an unreasonable risk of harm to the invitee notwithstanding his knowledge, warning, or the obvious nature of the condition." Id. (quoting Prosser and Keeton, The Law of Torts, § 61, p. 427 (1984) (formatting in quotation omitted)).

The exception to the "open and obvious" rule should apply, argues Pinson, because 45 Development should have anticipated that he would be endangered by the canopy design. Even if the canopy were seen as a "hazard" under Arkansas tort law,[2] we conclude that it was an open and obvious one. It would have been apparent to a master sign electrician like Pinson that there was no access panel on the canopy and that its bottom was not weight bearing. Pinson has not shown that 45 Development should have anticipated someone using his method of accessing the interior of the canopy. Thus the situation was unlike Kuykendall, 504 S.W.2d at 346, where the plaintiff was forced to use an icy path in order to make a delivery. The record here shows that Pinson could have called for assistance, created an access panel himself, or obtained additional equipment from his employer. Pinson has not shown that 45

_____

[2] As the district court pointed out, the canopy was dissimilar to hazards in Arkansas cases recognizing a duty of care (such as a falling tree limb, spilled diesel fuel, or accumulated ice and snow). Pinson was not injured at the time he encountered the canopy, but rather by the way he later attempted to access it.

Development should have anticipated that he would attempt to install the Citi Trends sign in a way that would cause injury.  Thus, the exception to the "open and obvious" rule does not apply.

A separate line of Arkansas cases addresses the duty owed by employers to independent contractors.  The district court determined that Pinson, an employee of Anchor Sign which had been hired by Citi Trends, was an independent contractor.  It is well established that the employer of an independent contractor has a common law duty "to use ordinary care or to warn of latent dangers" but this does not include "a duty to warn of obvious hazards which are an integral part of the work the contractor was hired to perform."  Jackson v. Petit Jean Elec. Co-op, 606 S.W.2d 66, 68 (Ark. 1980); see also Griffin, 76 S.W.3d at 262.  In Petit Jean, the Arkansas Supreme Court concluded that Petit Jean Electric Co-op had no duty to insulate or isolate hot wires or to deenergize electrical lines when its independent contractor's "compensation and contractual obligations expressly contemplate[d] working around energized lines." 606 S.W.2d at 68.  Similarly in Griffin, a warehouse owner had no duty to warn an independent contractor's employee about skylights in the roof he was to paint because that danger was obvious and integral to the work for which he had been hired.  76 S.W.3d at 262.

Our court recently applied Arkansas  law in another independent contractor case, which affirmed a grant of summary judgment in the Eastern District of Arkansas. See Chew v. Am. Greetings Corp., --- F.3d ----, 2014 WL 2609627 (8th Cir. 2014) (affirming Chew v. Am. Greetings Corp., 2013 WL 812363 (E.D. Ark. March 5, 2013)).  We concluded in Chew that a business did not have a duty to electrical utility employees who were injured while repairing an electrical line because their injuries resulted from "obvious risks of electricity inherent in their profession."  Id. at *1, *4. We recognized the principle established in Petit Jean that an independent contractor is in the best position to assess risks inherent to the trade.  Id. at *4.

The district court concluded in this case that the hazards Pinson encountered were "open, obvious, known to him before he ascended to the roof and undertook the risk of falling, and, perhaps most importantly, integral to the work he was contracted to perform." Anchor Sign was an independent contractor hired by Citi Trends, which leased the store from 45 Development. While landowner 45 Development did not employ Anchor Sign, the reasoning of the Petit Jean line of cases applies because the danger Pinson encountered in accessing the sign was an integral part of his job as a master sign electrician, one which his "compensation and contractual obligations expressly contemplate[d]." Petit Jean, 606 S.W.2d at 68.

Any hazard posed by the canopy was obvious. Pinson testified that he knew the soffit was not weight bearing. Furthermore, Pinson was licensed as a "master sign electrician" and had over ten years of experience in the field. Working at an elevation was a danger inherent to his job. Harry Barber, the Anchor Sign human resources director, testified that "most of the time" Anchor Sign employees were working at heights of "15, 20, 25 feet." Pinson had received training in fall prevention and in the use of ladders. Derrick Stewart, who accompanied Pinson the day of the accident, testified that there had been prior sign installation jobs where he had arrived and found there was no access to the sign. The record indicates that the risks Pinson faced in accessing the canopy were an integral part of his job, similar to the risks of skylights encountered both by an independent contractor painting a roof, Griffin, 76 S.W.3d at 262, and an independent roofing contractor, Crenshaw v. Ark. Warehouse, Inc., 379 S.W.3d 515, 516–17 (Ark. Ct. App. 2010). To make 45 Development responsible for the accident here would defeat the purpose of hiring contractors with relevant expertise. We conclude that 45 Development had no duty to warn Pinson of an obvious hazard integral to his work. See Griffin, 76 S.W.3d at 262; Petit Jean, 606 S.W.2d at 68.

Pinson also argues that the Occupational Safety and Health Act (OSHA), the International Builders Code, and the National Electrical Safety Code established a

standard of care breached by 45 Development at the time of his injury. The district court concluded that any such safety violations could be presented to a jury as evidence of negligence, but that they were not relevant at the summary judgment stage. OSHA does not generally expand employer duties from those at common law, and the statute does not create a private right of action nor does it preempt state law. See 29 U.S.C. § 653(b)(4); Solis v. Summit Contractors, Inc., 558 F.3d 815, 828–29 (8th Cir. 2009). Pinson also failed to demonstrate that other safety codes, even if adopted by statute in Arkansas, establish a standard of care or expand 45 Development's common law duty. As we pointed out in Chew, "Arkansas courts have been hesitant to permit Arkansas statutes and regulations to expand common law causes of action" without "clear legislative intent." Chew, 2014 WL 2609627, at *4 (comparing Cent. Okla. Pipeline, Inc. v. Hawk Field Servs., LLC, 400 S.W.3d 701, 711 (Ark. 2012); Kowalski v. Rose Drugs of Dardanelle, Inc., 378 S.W.3d 109, 118–19 (Ark. 2011), with Shannon v. Wilson, 947 S.W.2d 349, 356–58(Ark. 1997)).

We conclude that Pinson failed to show that 45 Development owed him a duty; thus his negligence claim fails as a matter of law. See Griffin, 76 S.W.3d at 262. Pinson did not demonstrate a genuine issue of material fact as to whether the exception to the "open and obvious" rule applied, and his argument that 45 Development had a duty to warn him about the construction of the canopy is further undermined by his status as an independent contractor. We do not address breach of duty or proximate cause because Pinson has not demonstrated a genuine issue of material fact as to the first element of his negligence claim.

For these reasons, we affirm the judgment of the district court.

_____