# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1153

_____

Rebecca L. Nichols

*Plaintiff - Appellant*

v.

Tri-National Logistics, Inc.; RMR Driver Services, Inc.; James Paris, in his
individual capacity; Charles Kye, in his individual and official capacities; Donald
Lewis, in his individual and official capacities

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 21, 2015
Filed: January 4, 2016

_____

Before MURPHY, MELLOY, and SMITH, Circuit Judges.

_____

MURPHY, Circuit Judge.

During 2011 and 2012 Rebecca Nichols drove a semi truck for Tri-National
Logistics and RMR Driver Services (collectively "TNI"). During the period from
May 25 until June 1, 2012 her fellow driver, James Paris, made unwelcome sexual
advances. Then on a mandatory layover, he took away her truck keys and cell phone

while continuing to proposition her. On May 25, 2012 Nichols reported his behavior to TNI and again up to June 1. After TNI terminated Nichols on June 25, 2012 citing her poor safety record, she brought this action charging TNI with discrimination on the basis of sex, termination in retaliation for her complaints, and violation of the Fair Credit Reporting Act ("FCRA"). She also charged Paris with intentional infliction of emotional distress. Paris has counterclaimed for breach of contract, unjust enrichment, and money lent. The district court granted summary judgment to the defendants, and Nichols appeals. We reverse and remand.

I.

Rebecca Nichols was a TNI employee in August and September of 2011. About three weeks after Nichols was hired, she was cited for nonoperational turn signals and tail lights. While she was pulling away from that stop, her truck stuck in the mud and TNI had to pay thousands of dollars for towing and repairs as well as damage at the site. Eleven days later Nichols damaged the door of the trailer she was driving. TNI terminated her after determining that both incidents had been preventable.

When TNI rehired Nichols in October 2011, it informed her that she could no longer drive alone and was responsible for finding her own driving partner. The first partner she drove with was Catherine Harrington who considered Nichols an unsafe driver with whom she did not want to work. Harrington told TNI that Nichols took her hands and eyes off the road to use her cell phone while driving, used unapproved routes in violation of TNI policy, had consistent problems connecting her tractor to the trailer, and at least once forgot to latch the trailer doors. Her second partner was Robert Ripke who also complained that Nichols had unsafe driving habits. Later while driving with Lance Wehrle, Nichols received a citation for driving through a stop sign, causing a three car accident and thousands of dollars in damage. Wehrle

also complained to TNI about Nichols' driving and stopped driving with her in early May 2012.

At that point Nichols began driving with James Paris. During their first trip Paris asked Nichols if she was interested in a romantic relationship. Nichols declined the offer but did not report it to TNI. She was scheduled to drive with Paris again from May 25 to 30. Their truck on that trip had a sleeping compartment in the back of the cab separated from the two driver seats by a curtain. According to her deposition testimony, Paris opened the cab's curtain and exposed himself while Nichols was driving. Upset, she told him to get dressed and "not to behave that way." According to Nichols, she immediately reported this incident to Melissa Foust in TNI's safety department.

Nichols testified that after this initial incident, Paris would often stand in the back of the cab while she was in the driver seat, lean over her in his underwear with his hands on the overhead compartment. Nichols testified that this happened on three or four occasions and that at least once his genitals were visible through a hole in his underwear. When asked at her deposition if he had ever done this more than once on the same day, Nichols replied "Not that I remember offhand." Nichols told Melissa Foust about similar conduct by Paris five times during their six day trip. Nichols told Foust that she nevertheless did not want to change assignments before she could find another driving partner because she needed to work to pay her bills. Nichols also reported Paris' conduct to a TNI dispatcher, Bob Oliver, several days before May 30. According to her deposition, Oliver just told Nichols to try to "endure it" until the trip was complete, at which point he would help find her another partner.

After Nichols and Paris made their delivery in Laredo, Texas on May 30, they drove approximately three hours to his home in Pharr, Texas for a mandatory 34 hour rest period. Nichols testified that she went along with Paris to Pharr because she had been told another driver would not be available until after the rest period. Her request

to take the truck to a place where she could stay overnight was denied because Paris had personal possessions in the cab. Nichols complained to the dispatcher, "Bob, I can't believe your telling me that. Didn't I just tell you maybe an hour ago that the man was trying to control me to no hilt and I couldn't get away from him?" Oliver responded "[t]ry to get along with him until you guys get back out on the road" and offered to pay half the cost of a motel room. Nichols decided to sleep in the truck instead on the night of May 30.

When Nichols asked Paris to take her to a motel on May 31, he asked her to sleep with him. He proposed that in return he would forgive an eight hundred dollar debt she owed him. Nichols testified that when she refused, Paris became "excessively mad," verbally degraded her, and twice forcibly took away her keys and cell phone. Eventually Paris did take Nichols to a motel where she spent the night, and on the next day he drove her back to Laredo where she got on the truck of another TNI driver, Chris Loya. Nichols then reported Paris' conduct in Pharr to TNI and said that it had caused her to feel abused, scared, and degraded.

From June 1 to 22 Nichols drove with Chris Loya. He later reported to TNI that she had driven over the speed limit, kept her tractor brakes on, failed to anticipate traffic light changes, run through at least one red light, and talked on her handheld cell phone while driving. After Donald Lewis, TNI's Field Safety Supervisor, heard Loya's reports about Nichols' driving he told Charles Kye, TNI's Vice President of Operations, that she should be discharged. Kye terminated Nichols on June 25, 2012.

Nichols sued TNI, Paris, Kye, and Lewis, claiming that TNI had discriminated against her on the basis of her sex in violation of Arkansas Civil Rights Act ("ACRA") and Title VII, that TNI, Kye, and Lewis had retaliated against her for complaining about sexual harassment, and that TNI had violated FCRA by submitting incomplete and inaccurate driving reports to HireRight, an employee background check company. Nichols also sued Paris for intentional infliction of emotional

-4-

distress. Paris counterclaimed, alleging that Nichols had failed to repay over a thousand dollars she owed him. The district court granted the motion for summary judgment by TNI, Kye, and Lewis and declined to exercise supplemental jurisdiction over Nichols' state law claims. Nichols appeals all but the dismissal of her FCRA claims.

## II.

We review a grant of summary judgment de novo and consider the facts in the light most favorable to the nonmoving party. Pinson v. 45 Dev., LLC, 758 F.3d 948, 951 (8th Cir. 2014). Summary judgment is only appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Id. at 951–52.

Nichols alleged claims for hostile work environment and sex discrimination under Title VII and ACRA. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986); McCullough v. Univ. of Ark. for Med. Sci., 559 F.3d 855, 861 (8th Cir. 2009). Under these statutes, it is illegal for an employer to discriminate against an employee because of her sex. 42 U.S.C. § 2000e-2(a)(1); Ark. Code § 16-123-107. To establish a hostile work environment claim Nichols must show that: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of her employment; and (5) her employer knew or should have known of the harassment and failed to take appropriate remedial action. E.E.O.C. v. CRST Van Expedited, Inc., 679 F.3d 657, 683 (8th Cir. 2012). Actionable harassment must have been both objectively and subjectively offensive affecting a term of employment. Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759 (8th Cir. 2004).

The district court erred when analyzing Nichols' sexual harassment claim by not considering all that had occurred during the 34 hour rest period in Pharr. Under

Title VII "offensive conduct does not necessarily have to transpire at the workplace in order for a juror reasonably to conclude that it created a hostile working environment." Dowd v. United Steelworkers of Am., Local No. 286, 253 F.3d 1093, 1102 (8th Cir. 2001). For example, in Moring v. Arkansas Department of Corrections, 243 F.3d 452 (8th Cir. 2001), a Title VII sexual harassment verdict was upheld on appeal where the offensive conduct had occurred in a hotel room after business hours. Nichols' time in Pharr was part of her work trip because she stopped there during a mandatory rest period, and Oliver told her he would only find her a driver after it was completed. The TNI truck was the only form of transport available to her at the time, and Oliver instructed Nichols she could not use it to drive to a motel.

The district court treated Nichols' decision to remain with the truck as her own choice, but the law does not require an employee to "quit or want to quit" when faced with a Hobson's choice. See Davis v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998). Such a requirement could force an employee to choose between her employment and her right to file a legal claim. The appropriate test is whether Nichols subjectively perceived her work environment as offensive. See Bainbridge, 378 F.3d at 759.

The record contains genuine issues of material fact about all that happened on the trip and whether Nichols subjectively perceived Paris' actions as offensive. Nichols testified at her deposition that after he exposed himself, she was upset, told him not to behave that way, and complained immediately to TNI. Nichols also testified that she complained to Melissa Foust about Paris five times throughout the trip and reported to Oliver on June 1 that she felt abused, degraded, and scared. A psychiatrist who performed an independent medical examination testified that Nichols felt sexually harassed and suffered from depression and post-traumatic stress disorder due to Paris' aggressive conduct seeking sex. Although Nichols need not prove

psychological injury, the psychiatrist's testimony bolsters her claim that she felt abused and harassed.  See Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993).

The district court erred in finding that Nichols did not report Paris' conduct to TNI until June 1.  Nichols alleges that after Paris first exposed himself, she immediately reported it to Melissa Foust, a TNI safety department employee.  Nichols testified that after this first incident, Paris leaned over her in his underwear three or four times.  When asked at her deposition if such subsequent actions ever took place on the same day, Nichols replied "Not that I remember offhand."  The test of whether a company is considered to have actual knowledge of harassing conduct is whether sufficient information comes "to the attention of someone who [had] the power to terminate the harassment."  Sandoval v. Am. Bldg. Maint. Indus., Inc., 578 F.3d 787, 802 (8th Cir. 2009).

When the evidence is viewed in the light most favorable to Nichols, her initial report to Foust about Paris must have been on Friday, May 25.  It could not have been on Saturday, May 26 or Sunday, May 27 because Foust had not worked on the weekend.  She could also not have initially reported during the last three days of the trip.  When the evidence is viewed in the light most favorable to Nichols, there were four distinct days during which Paris leaned over her in his underwear.  Foust's regular work hours were 8:00 AM to 5:00 PM, and the record reflects that on Friday, May 25 Nichols called TNI six times between 2:48 PM and 5:47 PM.

TNI argues that even if Nichols did report Paris' conduct prior to June 1, she has not shown that the company failed to take appropriate remedial action.  The factors to consider when assessing the reasonableness of an employer's actions "include the amount of time that elapsed between the notice and remedial action, the options available to the employer, . . . and whether or not the measures ended the harassment."  CRST, 679 F.3d at 692–93 (alteration in original, internal quotation marks omitted).  In CRST, we determined that the employer took appropriate

remedial action by: "(1) removing the [harassed] woman from the truck as soon as practicable [within 24 hours], arranging overnight lodging at a motel and subsequent transportation to a CRST terminal at the company's expense; (2) requesting a written statement from the [victim]; (3) relieving the [victim] from future assignments with the alleged harasser; and (4) reprimanding the alleged harasser and barring him from team-driving with women indefinitely." Id. at 693. We further noted that these "actions, not necessarily in combination, constitute the type of prompt and effective remedial action that our precedents prescribe." Id.

Unlike the employer in CRST, TNI did not remove Paris from her truck within 24 hours, proceed to investigate the alleged misconduct, or reprimand Paris. Nichols notified TNI about his harassment on May 25, and seven days elapsed before TNI arranged for Chris Loya to pick her up in Laredo. TNI could have ordered Nichols to leave Paris' truck as soon as it learned about the problem and promptly help her find another driving partner, reprimanded Paris for his behavior, or arranged lodging for her in Laredo instead of permitting her to accompany him to Pharr on May 30. Instead, TNI allegedly took no action to remove her despite her consistent complaints of sexual harassment, but allowed her to go to Paris' apartment in Pharr, and stranded her there with no available alternate form of transportation.

The dissent suggests that TNI's response was reasonable in comparison to several other cases it cites, but none of these cases involved a workplace at all like the confined environment of an over the road truck cab in which Nichols was isolated for a multi day trip. See Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 906 (8th Cir. 2006) (both parties were bank tellers); Barrett v. Omaha Nat'l Bank, 726 F.2d 424, 426 (8th Cir. 1984) (both parties worked at desks in an open public area); Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 986 (8th Cir. 1999) (plaintiff was a cashier and the alleged harasser bagged groceries). In contrast—in our case there are genuine issues of material fact in this record. These include whether TNI took appropriate remedial action in response to Nichols' personal plea to save her from

further harassment. On this full record the district court erred by dismissing Nichols' sexual harassment claim.

## III.

After all claims over which the district court had original jurisdiction had been dismissed, the court declined to extend supplemental jurisdiction over Nichols' claim against Paris for intentional infliction of emotional distress and his counterclaims relating to her alleged unpaid debt. Since the district court erred in granting summary judgment to TNI on Nichols' sexual harassment claim, we vacate the judgment and remand for consideration of whether Nichols' intentional infliction of emotional distress claim is "so related to the" alleged Title VII and ACRA claims that it forms "part of the same case or controversy" and consequently should be reinstated. Brown v. Mortg. Elec. Registration Sys., Inc., 738 F.3d 926, 933 (8th Cir. 2013).

## IV.

The district court granted summary judgment to TNI, Kye, and Lewis on Nichols' claim that she was fired in retaliation for reporting Paris' conduct to the company. To state a prima facie case of retaliation under Title VII and ACRA, Nichols had to show that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 864 (8th Cir. 2009). Under the McDonnel Douglas burden shifting framework, TNI rebutted Nichols' prima facie case by providing a nonretaliatory reason for her termination—her poor safety record. See Brannum v. Mo. Dep't of Corr., 518 F.3d 542, 547 (8th Cir. 2008). Nichols then failed to produce sufficient evidence of pretext.

Nichols points out that TNI fired her three weeks after her sexual harassment complaints, but "[e]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." Hervey v. Cty. of Koochiching, 527 F.3d 711, 723 (8th Cir. 2008) (internal quotation marks omitted). Here, there is sufficient evidence that TNI was concerned about Nichols' unsafe driving well before she complained about sexual harassment. Since no genuine issue of material fact has been presented to show that her termination was retaliatory, the district court properly granted the motion for summary judgment on this claim.

V.

We conclude that the district court erred in granting summary judgment on Nichols' Title VII and ACRA sex discrimination claims because genuine issues of material fact remain as to whether Nichols subjectively felt abused by Paris, that TNI was aware of his conduct, and that TNI failed to take appropriate action. The judgment of the district court is therefore reversed, and the case is remanded for proceedings not inconsistent with this opinion.

SMITH, Circuit Judge, dissenting.

I respectfully dissent. After reviewing the record in the light most favorable to Nichols, I conclude that Nichols has not demonstrated that TNI acted negligently in addressing her complaints. When an employee alleges sexual harassment by a coworker, "[a]n employer must be allowed some time to gauge the credibility of the complainant." *Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 988 (8th Cir. 1999). As a result, an employee often must "tolerate some delay" by an employer taking appropriate remedial action. *See id*.

Sexual harassment by a coworker is not a violation of Title VII unless an "employer knew or should have known of the harassment in question and failed to take proper remedial action." *Moylan v. Maries Cty.*, 792 F.2d 746, 750 (8th Cir. 1986) (citing *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982)). Consistent with the negligence standard used to evaluate an employer's response, we have refrained from requiring specific remedial measures. Instead, we have stated that "[f]actors in assessing the reasonableness of remedial measures *may include* the amount of time that elapsed between the notice and remedial action, the options available to the employer, . . . and whether or not the measures ended the harassment." *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir.1999) (emphasis added) (citations omitted). "Proper remedial action need be only 'reasonably calculated to stop the harassment' . . . ." *Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1125 (8th Cir. 2007) (quoting *Carter*, 173 F.3d at 702).

The majority concludes that the district court erred in finding that Nichols did not report Paris's conduct to TNI until June 1. Under the majority's factual reconstruction, Nichols's initial report to TNI regarding Paris "must have been on Friday, May 25."[1] The record may not support the district court's June 1 finding, but it also does not support the majority's May 25 finding. The majority states that Nichols alleges she "immediately" called Foust to report Paris's conduct after the first exposure. Nowhere in the record does Nichols make such a definitive statement. Rather, the record reflects only that Nichols called Foust to report Paris's conduct sometime after Paris first exposed himself to Nichols. Moreover, when the record is read to favorably harmonize Nichols's testimony, May 28 is the earliest Nichols could have called Foust to report Paris.

---

[1]Notably, nowhere does Nichols herself claim she reported Paris's conduct on May 25.

In her deposition, Nichols was asked when she "first called Melissa [Foust] after [Paris] exposed himself." In her answer, Nichols discussed two incidents in which Paris had exposed himself. According to Nichols:

> [The] [f]irst time he did it, he—I was driving days; he drove nights. And he was back in his bunk and the drapes—the curtains were pulled. First time he did it, he just threw the curtains open, standing there naked, exposing himself to me. And of course—and I was driving down the road at the time. And of course that upset me and I told him to get himself dressed and to not behave that way.
>
> Then the next time, what he did—he did this several times—but he was come up there right beside me, reaching into the shelf above the windshield, acting like he was getting something out of there. And he didn't have boxer shorts on. I never told anyone he had boxers on. He had the regular kind of underwear men wear.
>
> * * *
>
> But the legs were tremendously big on him. They completely gapped open. And when he stood right beside me, he was completely exposed to me where I could smell him. I could have reached over and bit it off. And I asked him to stop doing it.

Nichols then stated that she first called Foust "[t]hat time that he did it, he got up so close to my face, exposing himself, and I smelled him." Later, when asked if she called Foust "after that incident where [Paris] opened up the curtain and exposed himself," Nichols responded, "Yes. That's—I think that was the first time I called her." Construing these two answers in the light most favorable to Nichols, both are true only if the call to Foust occurred not only after Paris opened up the curtain and exposed himself but also after the time Paris got up close to Nichols's face and exposed himself.

-12-

Given that Nichols testified that Paris did not expose himself to her more than once in a day, the time Paris "got up so close to [Nichols's] face, exposing himself, and [she] smelled him" could not have occurred on May 25, the first day of the May 25–June 1 period with Paris. Foust did not work on May 26 or 27. Thus, May 28 is the earliest Nichols could have made her first call to Foust to report the exposures.

The majority's May 25 finding is unsupported by the record. As such, TNI's opportunity to take appropriate remedial action is significantly reduced. No specific time requirement exists for employers to respond to sexual harassment claims, but it must be reasonable under the circumstances. *Carter,* 173 F.3d at 702 (setting forth factors to assess the reasonableness of remedial measures, one of which is "the amount of time that elapsed between the notice and remedial action"). Applying existing circuit precedent, TNI took remedial action within a reasonable time of receiving notice from Nichols. In *Barrett v. Omaha National Bank*, we found an employer's response to an employee's sexual harassment complaint within four days to be prompt remedial action. 726 F.2d 424, 427 (8th Cir. 1984). Likewise, in *Green v. Franklin National Bank of Minneapolis*, we rejected an employee's claim that an employer failed to act promptly enough when it took remedial action nearly a month after learning of the harassment. 459 F.3d 903, 912 (8th Cir. 2006) (rejecting the cases that the employee cited to support her claim because they "involved situations where the employer waited much longer than one month to [take proper remedial action]").

Finally, in *Dhyne*, we considered it a "close question" whether an employer acted promptly enough when it delayed two months before taking remedial action. 184 F.3d at 987–88. The majority is correct that in *CRST* we determined that the employer took appropriate remedial action by removing the harassed employee from the truck within 24 hours; however, we did not set 24 hours as a minimum standard. *E.E.O.C. v. CRST Van Expedited, Inc.*, 679 F.3d 657, 693 (8th Cir. 2012) (finding that the employer removed the employees "from the truck as soon as practicable"). An

employer's response need not be ideal in every case but must be reasonable under the circumstances. *See, e.g.*, *Green*, 459 F.3d at 912 (finding that although employer's actions were less than ideal, they were sufficient); *Lapka v. Chertoff*, 517 F.3d 974, 987 (7th Cir. 2008) (concluding that an employer's "response may not have been perfect in all respects, but it was adequate").

Here, Paris's alleged harassment of Nichols ended not later than June 1. To be sure, no one should have to endure harassing conduct for any period, but employers can only be legally responsible for conduct of which they are made aware and fail to take timely, reasonable steps to correct. The time period between May 28 and June 1 is the very type of delay employees must unfortunately sometimes endure. Considering current precedent, where a two-month delay presented a "close question," I submit that the four-day delay here was not unreasonable.

This case also presents important contextual considerations in determining whether TNI acted negligently. First, the harassment at issue occurred in a truck that was scheduled to be on the road from May 25–June 1. Unlike the typical workplace context of an office, TNI could not immediately investigate. While TNI could have possibly removed Nichols immediately from Paris's truck, Nichols told TNI that she did not want to get off the truck until another codriver was found. Significantly, TNI's failure to remove Nichols from the truck was the only concrete criticism Nichols's expert had of TNI's response. The majority is correct that TNI could have reprimanded Paris. However, TNI's decision not to reprimand Paris immediately does not constitute actionable conduct. In choosing not to reprimand Paris before determining fault, TNI did not delay unreasonably in taking remedial action. *See Dhyne*, 184 F.3d at 988 (holding that an employer must be allowed some time to gauge the credibility of the complainant).

Contrary to the majority's characterization, I do not think TNI knew or should have known that Nichols needed to be saved. At most, TNI knew Paris was exposing

-14-

himself to Nichols but that Nichols did not consider the conduct so intolerable that she required immediate removal from the truck. As already mentioned, Nichols told TNI she wished to remain on the truck with Paris until a different driver could be located. Additionally, prior to going to Paris's residence for a mandatory 34-hour rest period, Paris and Nichols stopped at a TNI terminal in Laredo, Texas. Nichols did not take the opportunity to get off the truck; instead, she continued on with Paris to his residence. Certainly, an employee is not required to "quit or want to quit." *Davis v. U.S.P.S.*, 142 F.3d 1334, 1341 (10th Cir. 1998). However, Nichols would not have been quitting her job by getting off the truck in Laredo before accompanying Paris to his residence during the rest period. TNI was not negligent in construing Nichols's words and conduct as inconsistent with an employee requiring emergency action.

Finally, the harassment ended when TNI signed off on Nichols's request to team drive with Chris Loya rather than Paris. Even when employers do not act in an ideal manner, remedial action that effectively ends harassment can be deemed sufficient. *See Green*, 459 F.3d at 912. Accordingly, I would affirm the judgment of the district court.

———————————————————