# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-2846
_____

Hudson Enterprises, Inc., doing business as River Valley Marina

*Plaintiff - Appellant*

v.

Certain Underwriters at Lloyd's London Insurance Companies, Subscribing to
Policy #10NCG01559 and Agreement Numbers NPPI1011456 and NPPI09112456

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: April 5, 2017
Filed: April 28, 2017

_____

Before GRUENDER, MURPHY, and KELLY, Circuit Judges.

_____

MURPHY, Circuit Judge.

On the night of April 30, 2011 a storm generated strong winds and left seven inches of rain in the Little Maumelle River basin. The River Valley Marina lost five of its docks to the storm. The docks were covered by an insurance policy issued by Certain Underwriters at Llyod's London Insurance Companies (Underwriters) which excluded losses "caused directly or indirectly" by flood. Underwriters denied

coverage based on the flood exclusion. The marina then filed this action against Underwriters, alleging that they breached the policy. The district court[1] granted Underwriters summary judgment after concluding that the docks were lost to flood. Hudson appeals, and we affirm.

I.

Ray and Debra Hudson own Hudson Enterprises, which operates the River Valley Marina. The marina owns eight docks on the north bank of the Little Maumelle River in Little Rock, Arkansas. The Little Maumelle River runs west to east until it converges with the Arkansas River. The marina is located approximately two miles above the Little Maumelle's confluence with the Arkansas River.

On the night of April 30, 2011 approximately seven inches of rain fell in the Little Maumelle watershed. Several area residents testified that the river rose at least three feet above its normal levels and exceeded its banks in some places. Photos indicate that there was standing water in the parking lot near one of the marina's docks the next day. The rain also greatly increased the speed of the river's current. In addition to rain, the storm brought with it high winds that tore down tree branches near the marina.

The marina lost five of its eight docks to the storm. The three docks that survived the storm were located upstream from the docks that were swept away. The marina was covered by an insurance policy issued by Underwriters. After the storm, the marina contacted Underwriters to obtain compensation for the loss. Its policy insured the marina against "direct physical loss of or damage to" its eight docks. The policy contained an exclusion, however, which stated:

---

[1]The Honorable D.P. Marshall Jr., United States District Judge for the Eastern District of Arkansas.

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage affecting a substantial area, or remains localized - even when restricted to the insured premises.
. . . .
4. Water - (a) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not; . . . .

A few days after the storm, Underwriters sent an adjuster to take photographs of the marina and talk to the Hudsons. Mr. Hudson told the adjuster that the "[t]he velocity of that water" caused the damage to the docks. Underwriters denied coverage after finding that the loss was caused by "a flash flood that occurred on the Little Maumelle River following heavy rains." The Hudsons later came to believe, however, that a utility pole caused their loss when it fell onto the docks as a result of the storm's high winds.

Hudson Enterprises (Hudson) filed this action against Underwriters in state court. Underwriters removed the case to federal court. During discovery, Hudson served an interrogatory on Underwriters that stated, "In the course of your investigation of the facts and circumstances forming the basis for the claim for benefits tendered by Plaintiff . . . did you obtain any expert opinion relating to your determination to deny payment of such claim?" Underwriters answered on November 16, 2015 by stating "discovery is ongoing and [Underwriters] have not yet made a determination as to whether an expert witness may testify at trial." The answer then indicated "[i]f Underwriters decide to have a testifying expert, Underwriters will identify said expert(s) in accordance with the Federal Rules of Civil Procedure."

The district court entered a case scheduling order which required Underwriters to "identify all expert witnesses and produce their opinions by 27 January 2016."

Underwriters disclosed their civil engineering expert to Hudson on January 27, 2016. The expert concluded that the flash flood was the sole cause of Hudson's loss and rejected Hudson's utility pole hypothesis. Hudson objected to Underwriters' expert and asked that his opinions be stricken because the expert had been disclosed too late and because Underwriters had not supplemented their interrogatory answer after retaining him. At the hearing on Hudson's motion to strike, counsel for Underwriters stated that he had first contacted the expert on December 18 and had not received a draft expert report until the last week of January. The district court denied the motion to strike.

The parties later filed cross motions for summary judgment. The district court denied Hudson's motion and granted that of Underwriters. The court concluded that there was no genuine issue of material fact regarding whether or not a flood had caused the damage to Hudson's docks and that the policy exclusion therefore applied. Hudson appeals, arguing that the district court abused its discretion by refusing to strike the report and opinions of the Underwriters expert and erred by granting their motion for summary judgment.

II.

Hudson argues that the district court abused its discretion when it refused to strike Underwriters' expert report and opinions. We review a district court's "discovery rulings in a manner both narrow and deferential, and reversal is only warranted if an erroneous ruling amounted to a gross abuse of discretion." Robinson v. Potter, 453 F.3d 990, 994–95 (8th Cir. 2006) (internal quotation marks omitted). Hudson appears to argue that Underwriters disclosed their expert in an untimely fashion. A party must disclose expert testimony "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Underwriters thus complied with the Federal Rules of Civil Procedure by disclosing their expert on the last day allowed by the scheduling order.

Hudson also argues that the district court should have stricken the expert report for Underwriters because they did not supplement their interrogatory answers in a timely fashion after they had secured their expert. A party that has responded to an interrogatory "must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1). Hudson's interrogatory asked Underwriters if they had obtained "any expert opinion relating to your determination to deny payment of such claim." In November 2015 Underwriters responded that "they have not yet made a determination as to whether an expert witness may testify at trial." Underwriters counsel did not receive draft expert reports until the last week of January. On January 27, Underwriters disclosed to Hudson the reports and opinions of their two expert witnesses. Because only a few days had passed at most between when Underwriters obtained their expert's opinion and disclosed it to Hudson, we cannot conclude that the district court grossly abused its discretion by denying Hudson's motion to strike.

III.

Hudson argues that the district court erred by granting Underwriters summary judgment. We review a district court's "grant of summary judgment de novo and consider the facts in the light most favorable to the nonmoving party." Nichols v. Tri-Nat'l Logistics, Inc., 809 F.3d 981, 985 (8th Cir. 2016). A district court's grant of "[s]ummary judgment is only appropriate when 'there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.'" Id. (quoting Pinson v. 45 Dev., LLC, 758 F.3d 948, 951–52 (8th Cir. 2014)). We review de novo questions of contract interpretation. Anderson v. Hess Corp., 649 F.3d 891, 896 (8th Cir. 2011). It is undisputed that Arkansas law applies to this diversity action. See Emp'rs Reinsurance Co. v. Mass. Mut. Life Ins. Co., 654 F.3d 782, 789 (8th Cir. 2011).

-5-

Hudson first argues that the term "flood" in the exclusion to the insurance contract is ambiguous. In Arkansas, "the intent to exclude coverage in an insurance policy should be expressed in clear and unambiguous language, and an insurance policy, having been drafted by the insurer without consultation with the insured, is to be interpreted and construed liberally in favor of the insured and strictly against the insurer." Nationwide Mut. Ins. Co. v. Worthey, 861 S.W.2d 307, 310 (Ark. 1993). If policy language is ambiguous, "and it is fairly susceptible of two or more interpretations, one favorable to the insured and the other favorable to the insurer, the one favorable to the insured will be adopted." Id.

Hudson claims that the term "flood" is ambiguous because it is not defined in the policy. An undefined term in an insurance policy, however, is not automatically ambiguous. Essex Ins. Co. v. Holder, 261 S.W.3d 456, 458 (Ark. 2007). Moreover, the Arkansas Court of Appeals has concluded that an identically worded policy exclusion is unambiguous. Ebbing v. State Farm Fire & Cas. Co., 1 S.W.3d 459, 461–62 (Ark. Ct. App. 1999). Ebbing defined "flood waters" as "those waters above the highest line of the ordinary flow of a stream, and generally speaking they have overflowed a river, stream, or natural water course and have formed a continuous body with the water flowing in the ordinary channel." Id. at 462 (quoting Ferndale v. Great Am. Ins. Co., 527 P.2d 939, 940 (Colo. App. 1974)). Although only decisions from a state's highest court control our interpretation of state law, Hudson has not provided any reason why Ebbing is not predictive of how the Arkansas Supreme Court would rule on this issue. See Pinson, 758 F.3d at 952. We therefore conclude that the term "flood" in this insurance contract is unambiguous and adopt the definition of "flood" given in Ebbing.

Hudson next argues that there is a genuine issue of material fact as to whether the damage to the docks occurred as the result of a flood. Hudson claims that strong winds were the sole cause of its damages here because they caused a utility pole to crash into its docks. In support of this claim, Hudson relies on the testimony of

several area residents that the storm on April 30 and May 1 involved very strong winds that knocked down tree limbs. Hudson also submitted evidence that the winds were gusting at 40 miles per hour during the storm. Hudson finally relies on a photograph that shows a downed utility pole lying on one of the marina docks.

Underwriters' civil engineering expert rejected Hudson's utility pole hypothesis. Its expert concluded that the utility pole had not fallen down as the result of wind because it would have taken wind gusts of more than 200 miles per hour to knock down a utility pole of that size. The expert also concluded that even if the wind had caused the pole to fall, the impact could not have caused the structural damage to the docks. In light of this expert report, Hudson's submission of lay testimony that the storm generated strong wind gusts and a photograph of the downed utility pole did not create a genuine issue of material fact as to whether wind or flood caused the damage to the docks.

Hudson alternatively argues that the damage here was not caused by a "flood" but rather by strong "current within the banks of" the Little Maumelle River. There is however no genuine issue of material fact that the storm on the night of April 30 caused the waters of the Little Maumelle to rise "above the highest line of the ordinary flow" of the river. See Ebbing, 1 S.W.3d at 462 (quoting Ferndale, 527 P.2d at 940). Several lay witnesses testified that the storm caused the river to rise at least three feet above its ordinary flow level. Moreover, both parties agree that the storm caused the river to overflow its banks and left standing water in a parking lot near one of the marina's docks. The facts show that the rain event on the night of April 30 created a flood on the Little Maumelle River.

There is also no genuine issue of material fact that the force generated from the flood waters directly or indirectly caused the damage to the marina's docks. The Underwriters expert opined that at the time of the storm, the river's current would have exerted at least 75,000 pounds of hydrodynamic force on the docks. The expert

further stated that 75,000 pounds was "much more than enough force" to cause the damage to the marina because the cables securing the docks to the riverbank were only rated for 14,400 pounds of force. Hudson's argument that the damage was the result of a strong current within the banks of the Little Maumelle River does not defeat summary judgment because this damage was caused by the strong current in waters which were "above the highest line of the ordinary flow" of the river. See Ebbing, 1 S.W.3d at 462 (quoting Ferndale, 527 P.2d at 940). At the very least, the flood indirectly caused the damage to the marina.

IV.

For the reasons stated above, we affirm the district court.

_____