# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1518
_____

Paul Gerlich; Erin Furleigh

*Plaintiffs - Appellees*

v.

Steven Leath; Warren Madden; Thomas Hill; Leesha Zimmerman

*Defendants - Appellants*

------------------------------

Student Press Law Center; Ratio Christi; Students for Life of America; Christian Legal Society; Young America's Foundation; Young Americans for Liberty

*Amici on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: December 14, 2016
Filed: June 13, 2017

_____

Before LOKEN, MURPHY, and KELLY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Iowa State University (ISU) grants student organizations permission to use its trademarks if certain conditions are met. The ISU student chapter of the National Organization for the Reform of Marijuana Laws (NORML ISU) had several of its trademark licensing requests denied because its designs included a cannabis leaf. Two members of the student group subsequently filed this 42 U.S.C. § 1983 action, alleging various violations of their First and Fourteenth Amendment rights. The district court[1] granted plaintiffs' summary judgment motion in part and entered a permanent injunction against defendants. Defendants appeal, and we affirm.

I.

ISU is a land grant university that has an enrollment of over 36,000 students and approximately 800 officially recognized student organizations. Student groups often create merchandise that contains the group's name and ISU insignia to generate awareness about the group's cause or attract members. Student groups may use ISU's trademarks on merchandise if ISU's Trademark Licensing Office (Trademark Office) determines that the use complies with ISU's Guidelines for University Trademark Use by Student and Campus Organizations (Trademark Guidelines). ISU's trademarks include word marks like "ISU" and "Iowa State," as well as logos, such as the school's mascot (Cy the Cardinal). At all relevant times, Leesha Zimmerman was the director of ISU's Trademark Office and reported to Warren Madden, Senior Vice President of the Division of Business & Financial Affairs.

NORML ISU is an officially recognized student organization at ISU. It is a student chapter of the national NORML organization and its purpose is to reform federal and state marijuana laws. The group was refounded in 2012. In October 2012, NORML ISU submitted a t-shirt design (T-Shirt Design #1) to the Trademark Office

---

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

that had "NORML ISU" on the front with the "O" represented by Cy the Cardinal. On the back the shirt read, "Freedom is NORML at ISU" with a small cannabis leaf above "NORML." The Trademark Office approved T-Shirt Design #1.

On November 19, 2012, the Des Moines Register published a front page article about the marijuana legalization referenda in Colorado and Washington and pending legislative efforts in Iowa to legalize recreational and medicinal marijuana. The article quoted NORML ISU President Josh Montgomery regarding the group's political efforts to change Iowa's marijuana laws. The article then stated "Montgomery said his group has gotten nothing but support from the university. He even got approval from the licensing office to make a NORML T-shirt with the ISU logo; the red shirt features Cy the Cardinal on the front, and a pot leaf on the back . . . ." The article also contained a photograph of the front and back of T-Shirt Design #1.

At 8:50 AM on November 19, Zimmerman provided ISU's public relations office with the following statement regarding the article:

> The university's Trademark Policy and Student Use Guidelines allow officially recognized student organizations the ability to use Iowa State's trademarks as long as they observe the proper procedures and follow specified design standards. Groups, including NORML, may use any of the university's indicia (names, graphics, logos, etc.) as long as they seek review and approval from the Trademark Licensing Office, which they did for the T-shirts. This does not mean that we take a position on what any of the organizations represent. We have 800 groups from The ISU Line Dancer's [sic], CUFFS, the ISU Baseball Club, LGBTAA, John Paul Jones Society, Game Renegades, ROTC, and many more. I believe that the statement in the article indicating "his group has gotten nothing but support from the university" is a bit misleading. He may be confusing recognition of the group as the university "supporting" it.

Later that morning, an Iowa House Republican caucus staff person sent a formal legislative inquiry to ISU's State Relations Officer asking whether "ISU's licensing office approve[d] the use of the ISU logo on the NORML t-shirt" pictured in the article. This request was forwarded to ISU President Steven Leath and his chief of staff, Miles Lackey, at 1:08 PM.

At 2:00 PM Madden told Thomas Hill, Senior Vice President for Student Affairs, Zimmerman, and other ISU administrators that Lackey indicated that ISU was "getting some push back regarding the Register article," and that "[h]e wants to place this on" the president's cabinet meeting discussion agenda. Leath later testified that "the reason it was on the agenda is because we were getting pushback. If nobody'd ever said anything, we didn't know about it, it didn't appear in The Register, we'd probably never raised the issue."

At 3:00 PM Leath emailed Lackey to ask whether ISU could "revoke" the approval of T-Shirt Design #1 "without more damage." Leath explained this email at his deposition by stating "[i]f we gave approval to something that was inappropriate, we might want to consider revoking it, but we could just make the problem worse, and I was asking for his advice."

At 3:19 PM Leath stated in an email to Madden "[w]e need to deal with this. . . . What were they thinking?" Leath explained at his deposition that because T-Shirt Design #1 "had some political public relations implications," someone should have "run it up the chain" because "there are some issues that are clearly going to cause controversy and it's better to manage them on the front end." Leath also testified that "my experience would say in a state as conservative as Iowa on many issues, that" T-Shirt Design #1 "was going to be a problem."

On November 20, Dale Wollery of the Governor's Office of Drug Control Policy emailed and called the head of ISU's government relations office about the

article. Wollery's email indicated that he was "curious about the accuracy of the student's statement cited in the report, and perhaps the process used by ISU to make such determinations." Wollery's concerns were shared with Zimmerman, Lackey, and Leath on November 21. Leath testified at his deposition that "anytime someone from the governor's staff calls complaining, yeah, I'm going to pay attention, absolutely." Leath further elaborated, "we are a state entity and he's the chief executive of the state, and so directly or indirectly we're responsible to the governor."

On November 21, the head of ISU's public relations office responded to Wollery's messages by stating that NORML ISU's use of ISU's trademarks was "permitted under the policies governing student organizations." The email went on to say, "[h]owever, this procedure is being reviewed."

On November 24, NORML ISU requested permission from ISU's Trademark Office to use T-Shirt Design #1 for another order. Madden decided to place this reorder on hold until after the president's cabinet meeting. Madden testified that he did not order the Trademark Office to hold reorder approvals for any other campus group. Zimmerman testified that she could not think of any other time that the Trademark Office had placed a student group request on hold. The president's cabinet meeting took place on November 26. After discussing the Des Moines Register article and NORML ISU's reorder request, the group agreed that ISU's Trademark Guidelines had to be changed.

Madden and Hill met with members of NORML ISU on November 29. Madden and Hill referenced the Des Moines Register article and expressed concern that the group's use of ISU's trademarks on T-Shirt Design #1 caused confusion as to whether ISU endorsed the group's views regarding the legalization of marijuana. They then informed the group that the Trademark Office would not approve of any t-shirt design that used ISU trademarks in conjunction with a cannabis leaf. They also told the group that it was required to obtain approval for any future designs from Madden

-5-

and Hill prior to submitting the designs to the Trademark Office. Zimmerman testified that to her knowledge this was the first time ISU had imposed a prior review procedure to a student group's trademark design application process.

NORML ISU's reorder of T-Shirt Design #1 was rejected by ISU's Trademark Office on December 3. On January 16, 2013 the Trademark Guidelines were revised. The new Trademark Guidelines prohibited "designs that suggest promotion of the below listed items . . . dangerous, illegal or unhealthy products, actions or behaviors; . . . [or] drugs and drug paraphernalia that are illegal or unhealthful." Madden indicated that this revision to the Trademark Guidelines "was done as the result of a number of external comments including interpretations that the t-shirt developed indicated that Iowa State University supported the NORMAL [sic] ISU advocacy for the reform of marijuana laws."

After the Trademark Guidelines were revised, the Trademark Office rejected every NORML ISU design application that included the image of a cannabis leaf. The Trademark Office also rejected designs that spelled out the NORML acronym but replaced "Marijuana" with either "M********" or "M[CENSORED]." The Trademark Office however approved several designs which did not use a cannabis leaf, but simply stated the group's name, and fully spelled out the NORML acronym.

In July 2014 Paul Gerlich and Erin Furleigh filed this action against Leath, Madden, Hill, and Zimmerman stating claims under 42 U.S.C. § 1983 for alleged violations of their First and Fourteenth Amendment rights. At the time the complaint was filed, Gerlich was the president of NORML ISU and Furleigh was the group's vice president. Count I alleged that defendants' trademark licensing decisions, as applied to plaintiffs, violated their right to free speech. Counts II through IV alleged that the trademark guidelines were unconstitutional on their face and unconstitutionally vague. After the district court concluded that defendants were not entitled to qualified immunity, it granted plaintiffs' motion for summary judgment on

Count I but dismissed Counts II through IV. The district court also entered a permanent injunction that prohibits defendants "from enforcing trademark licensing policies against Plaintiffs in a viewpoint discriminatory manner and from further prohibiting Plaintiffs from producing licensed apparel on the basis that their designs include the image of a . . . cannabis leaf."

## II.

Defendants argue that the district court improperly concluded that plaintiffs have standing to bring this action. We review de novo "the district court's conclusion that the plaintiffs had standing." Jones v. Gale, 470 F.3d 1261, 1265 (8th Cir. 2006). Standing is a "jurisdictional prerequisite that must be resolved before reaching the merits of a suit." Hodak v. City of St. Peters, 535 F.3d 899, 903 (8th Cir. 2008) (quoting Medalie v. Bayer Corp., 510 F.3d 828, 829 (8th Cir. 2007)). Under Article III of the Constitution, a plaintiff must demonstrate three elements to establish standing: "(1) injury in fact, (2) a causal connection between that injury and the challenged conduct, and (3) the likelihood that a favorable decision by the court will redress the alleged injury." Young Am. Corp. v. Affiliated Computer Servs. (ACS), Inc., 424 F.3d 840, 843 (8th Cir. 2005). Plaintiffs bear the burden of proving these elements. See id.

Defendants argue that plaintiffs lack an injury in fact because plaintiffs are asserting NORML ISU's right to free speech, not their own. To establish an injury in fact, a party must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982). An injury is defined under 42 U.S.C. § 1983 as a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

We conclude that plaintiffs suffered an injury in fact in their individual capacities, and that they therefore have standing to bring this action. Plaintiffs' attempts to obtain approval to use ISU's trademarks on NORML ISU's merchandise amounted to constitutionally protected speech. See, e.g., Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828–37 (1995). Plaintiffs' allegations that ISU violated their First Amendment rights by rejecting their designs and therefore preventing their ability to spread NORML ISU's message are sufficient to establish an injury in fact. Moreover, in both Widmar v. Vincent, 454 U.S. 263 (1981), and Rosenberger, 515 U.S. 819, individual students sued universities on behalf of their student organizations and the Supreme Court did not conclude that it lacked subject matter jurisdiction over the students' actions. We therefore conclude that plaintiffs have standing to bring this action.

## III.

Defendants next argue that the district court erred by denying them qualified immunity and granting plaintiffs summary judgment on their as applied First Amendment claim. We review a district court's "grant of summary judgment de novo and consider the facts in the light most favorable to the nonmoving party." Nichols v. Tri-Nat'l Logistics, Inc., 809 F.3d 981, 985 (8th Cir. 2016). A district court's grant of "[s]ummary judgment is only appropriate when 'there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.'" Id. (quoting Pinson v. 45 Dev., LLC, 758 F.3d 948, 951–52 (8th Cir. 2014)).

To review the denial of qualified immunity, we examine "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." See Foster v. Mo. Dep't of Health & Senior Servs., 736 F.3d 759, 762 (8th Cir. 2013) (quoting Winslow v. Smith, 696 F.3d 716, 731 (8th Cir. 2012)). We may take up these questions in either order. Id. at 763.

A.

We begin with plaintiffs' claim that defendants violated their First Amendment rights by engaging in viewpoint discrimination.

1.

If a state university creates a limited public forum for speech, it may not "discriminate against speech on the basis of its viewpoint." Rosenberger, 515 U.S. at 829. A university "establish[es] limited public forums by opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects." Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 679 n.11 (2010) (internal quotation marks and citation omitted). A university's student activity fund is an example of a limited public forum. See Rosenberger, 515 U.S. at 823–27, 829–30. ISU created a limited public forum when it made its trademarks available for student organizations to use if they abided by certain conditions.

The defendants' rejection of NORML ISU's designs discriminated against that group on the basis of the group's viewpoint. The state engages in viewpoint discrimination when the rationale for its regulation of speech is "the specific motivating ideology or the opinion or perspective of the speaker." Rosenberger, 515 U.S. at 829. Every viewpoint discrimination claim "requires, by its very nature, that the purposes or motives of governmental officials be determined." Gay & Lesbian Students Ass'n v. Gohn, 850 F.2d 361, 367 (8th Cir. 1988). Viewpoint discrimination "can be justified only if the government demonstrates that its regulation is narrowly drawn and is necessary to effectuate a compelling state interest." Id. at 366.

The defendants' discriminatory motive is evidenced by the unique scrutiny defendants imposed on NORML ISU after the Des Moines Register article was published. For example, after the article had been published, defendants placed NORML ISU's reorder of T-Shirt Design #1 on hold despite the fact that the

Trademark Office had already approved the design. Defendants claim that the hold on NORML ISU's reorder request was not specific to that group because they also placed on hold a trademark request for a plaque made by the Association of Malaysian Students. Zimmerman indicated in an email, however, that if that group were to tell administrators when it needed the plaque, the Trademark Office "may be able to move that review forward." ISU did not offer NORML ISU similar flexibility. Moreover, Zimmerman testified that she could not recall ever placing another student group's reorder request on hold, and Madden testified that he did not order the Trademark Office to hold reorder requests from any other student group.

Another example of the unique scrutiny imposed on NORML ISU is that the group was required to obtain approval from Madden and Hill for any future designs using ISU trademarks prior to submitting the designs to the Trademark Office. Zimmerman testified that to her knowledge this was the first time ISU had imposed such a prior review procedure. Defendants argue that this type of scrutiny was not unique to NORML ISU because the hockey club was also subject to additional oversight over its trademark applications. The university had imposed additional scrutiny on the hockey club because the club mismanaged funds and misrepresented itself as an intercollegiate sport, however. NORML ISU had not engaged in similar malfeasance. Moreover, the hockey club was not required to receive preapproval of its designs by two ISU senior vice presidents.

A third example of the unique scrutiny NORML ISU received is that NORML ISU is the only ISU student group to have had its trademark application denied for fear that the university would be endorsing a political cause. Defendants point to six examples of design requests that were rejected to avoid the appearance of an endorsement. All of these examples are inapposite, however. Four of the designs were rejected because it appeared ISU was endorsing a corporate logo. Another design was rejected because it suggested that a club sport was an official athletic department sport. The final design was rejected because it appeared that ISU was

endorsing the views of the Students for Life club, but the Trademark Office approved the design after the group made one minor change to the design.

Defendants' actions and statements show that the unique scrutiny they imposed on NORML ISU's trademark applications was motivated by viewpoint discrimination. After the Des Moines Register article was published, ISU stated that any student group could use the university trademarks "as long as they observe the proper procedures and follow specified design standards." ISU further stated that "[t]his does not mean that we take a position on what any of the organizations represent." After the governor's office and an Iowa House Republican Caucus staff person contacted ISU regarding the article, however, defendants immediately took measures to contain the political controversy by revising ISU's Trademark Guidelines and imposing unique scrutiny upon NORML ISU's trademark application process.

Defendants argue that the political pushback that they received regarding T-Shirt Design #1 did not play a role in their decision making. This argument ignores significant evidence to the contrary. For example, Leath testified that "anytime someone from the governor's staff calls complaining, yeah, I'm going to pay attention, absolutely." Leath also testified that the reason the Trademark Policy was on the president's cabinet meeting agenda which took place five days after the Des Moines Register article was published was "because we were getting pushback." Leath went on to testify that "[i]f nobody'd ever said anything, we didn't know about it, it didn't appear in The Register, we'd probably never raised the issue."

The record is also replete with statements from defendants regarding their political motives. Leath explained at his deposition that because T-Shirt Design #1 "had some political public relations implications," someone should have "run it up the chain" because "there are some issues that are clearly going to cause controversy and it's better to manage them on the front end." He also testified that "in a state as conservative as Iowa on many issues, . . . it was going to be a problem." Hill stated

-11-

in an interview with the <u>Ames Tribune</u> that the reason student groups associated with political parties could use ISU's logos, but groups like NORML ISU may not, is because "[w]e encourage students to be involved in their duties as a citizen." Such a statement implies that Hill believed that the members of NORML ISU were not undertaking their duties as citizens by advocating for a change in the law.

Zimmerman stated in an email to NORML ISU's faculty advisor in May 2013 that the group's design that included the statement "Legalize Marijuana" was rejected because "'Legalize Marijuana' is a call to action but it does not suggest any specific way your organization is making that happen." Zimmerman went on to say that the group's design applications "appear to have a certain shock or attention grabbing sensationalism." Zimmerman further stated that her "interpretation is that these do not further your cause as an advocate for change in the laws or trying to change the public's perception of marijuana." There is no evidence in the record of Zimmerman offering advocacy advice to any other student group.

Finally, Madden indicated that the Trademark Guidelines were revised "as the result of a number of external comments including interpretations that the t-shirt developed indicated that Iowa State University supported the NORMAL [sic] ISU advocacy for the reform of marijuana laws." As noted above, however, the Trademark Office had never before rejected a student group's design application due to confusion over endorsement of the group's cause. Moreover, defendants consistently stated throughout the record that a student organization's use of ISU marks does not indicate university approval of that group's beliefs.

The instant facts are somewhat similar to those in <u>Gay & Lesbian Students Ass'n v. Gohn</u>, 850 F.2d 361 (8th Cir. 1988). In that case, the University of Arkansas made funding available to student groups but denied funding one advocating for gay and lesbian rights. <u>Id.</u> at 362–65. We concluded that the university had engaged in viewpoint discrimination. <u>Id.</u> at 367. In reaching this conclusion our court relied on

the fact that the university followed an unusual funding procedure that was specific to the gay and lesbian group, some of the decision makers "freely admitted that they voted against the group because of its views," and "[u]niversity officials were feeling pressure from state legislators not to fund" the group. Id.

Similar to the university in Gohn, ISU followed an unusual trademark approval process with respect to all of NORML ISU's trademark design applications after the Des Moines Register article was published. Moreover, defendants at least implied that the additional scrutiny imposed on NORML ISU was due to the views for which it was advocating. Finally, defendants were motivated at least in part by pressure from Iowa politicians.

The district court did not err by concluding that defendants violated plaintiffs' First Amendment rights because defendants engaged in viewpoint discrimination and did not argue that their administration of the trademark licensing program was narrowly tailored to satisfy a compelling governmental interest.

2.

Defendants argue that even if they did engage in viewpoint discrimination, they did not violate plaintiffs' First Amendment rights because the administration of the trademark licensing regime should be considered government speech. The "Free Speech Clause restricts government regulation of private speech" but "it does not regulate government speech." Roach v. Stouffer, 560 F.3d 860, 863 (8th Cir. 2009) (quoting Pleasant Grove City v. Summum, 555 U.S. 460, 467 (2009)). When the "government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2245 (2015).

The government speech doctrine does not apply if a government entity has created a limited public forum for speech. Pleasant Grove City, 555 U.S. at 470, 478–80. As noted above, ISU created a limited public forum when it made its trademarks available for student organizations to use if they abided by certain conditions. The administration of its trademark licensing regime therefore did not constitute government speech.

Even if the trademark licensing regime here did not amount to a limited public forum, however, the government speech doctrine still does not apply on this record. The Walker decision considered three factors when determining whether certain speech is government speech. 135 S. Ct. at 2248–49. First, it determined whether the government has long used the particular medium at issue to speak. Id. at 2248. Second, it analyzed whether the medium is "often closely identified in the public mind with the" state. Id. (internal quotation marks omitted). Third, it determined whether the state "maintains direct control over the messages conveyed" through the medium. Id. at 2249.

The first two factors do not apply to the speech at issue in this case. ISU allows approximately 800 student organizations to use its trademarks. Defendants repeatedly stated in their testimony and other record evidence that the university did not intend to communicate any message to the public by licensing ISU trademarks to student groups. Indeed, the university licenses its trademarks to groups that have opposite viewpoints from one another like the Iowa State Democrats and the ISU College Republicans. Even if ISU's trademark licensing regime were to satisfy the final factor, the factors taken together would not support the conclusion that the speech at issue in this case is government speech because ISU does not use its trademark licensing regime to speak to the public.

B.

Having determined that plaintiffs' constitutional rights were violated, we next consider whether those rights were clearly established. For a right to be clearly established, its contours must be sufficiently clear so that a reasonable official would understand when his actions would violate the right. Foster, 736 F.3d at 762. There need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). The Supreme Court has recently explained that "'clearly established law' should not be defined 'at a high level of generality.'" White v. Pauly, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting Ashcroft, 563 U.S. at 742). That is, "the clearly established law must be 'particularized' to the facts of the case." Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Thus, the question here is whether plaintiffs' right not to be subject to viewpoint discrimination when speaking in a university's limited public forum was clearly established.

The first question is whether it was clearly established at the time of these events that ISU's trademark licensing program was a limited public forum. As the Supreme Court has repeatedly pointed out, a university "establish[es] limited public forums by opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects." Martinez, 561 U.S. at 679 n.11 (internal quotation marks and citation omitted); see also Rosenberger, 515 U.S. at 829–30: Widmar, 454 U.S. at 267 & n.5, 273. The Court held in Rosenberger, 515 U.S. at 829–30, for example, that a student activity fund provided a limited public forum. Iowa State University's trademark licensing program is similar to the student activity fund in Rosenberger because its own trademarks were made available to student organizations so long as they abided by certain rules. We conclude that it was clearly established at the time that ISU's trademark licensing program was a limited public forum.

-15-

Defendants argue that they did not violate clearly established law because at the time of this dispute the contours of the government speech doctrine were not clearly established. It was clearly established, however, that the government speech doctrine does not insulate a state actor from First Amendment scrutiny when the state has created a limited public forum for speech. In Rosenberger, the Court explained that "when the State is the speaker, it may make content-based choices." 515 U.S. at 833. Nevertheless, the speech of private persons in a limited public forum may not be subject to viewpoint discrimination. See id. at 834. As the Court noted in Summum, the forum doctrine rather than the government speech doctrine applies "in situations in which government-owned property or a government program [is] capable of accommodating a large number of public speakers without defeating the essential function of the land or the program." 555 U.S. at 478. The Court gave the student activity fund in Rosenberger as an example of an appropriate venue for forum analysis since that fund could "provide money for many campus activities." Id.

Like the university in Rosenberger, ISU was not engaging in government speech in this case because it had created a limited public forum to facilitate speech by private persons. See 515 U.S. at 833–34. Moreover, ISU's trademark licensing program was capable of accommodating a large number of student groups without defeating its essential function. See Summum, 555 U.S. at 478. The university has recognized approximately 800 student organizations and has approved trademark designs for groups such as the ISU College Republicans, Iowa State Democrats, Navy Marine Corps Drill Team, and Iowa State Fencing Club. Because ISU's trademark licensing program facilitated the speech of private persons and was capable of accommodating a large number of speakers, ISU's administration of that program was not government speech under clearly established law.

The next question is whether at that time it was clearly established that a university may not discriminate on the basis of viewpoint in a limited public forum. It has long been recognized that if a university creates a limited public forum, it may

not engage in viewpoint discrimination within that forum. Martinez, 561 U.S. at 667–68; Rosenberger, 515 U.S. at 829–30. The Supreme Court explained in Martinez that, "this Court has emphasized that the First Amendment generally precludes public universities from denying student organizations access to school-sponsored forums because of the groups' viewpoints." 561 U.S. at 667–68 (citing Rosenberger, 515 U.S. 819; Widmar, 454 U.S. 263; Healy v. James, 408 U.S. 169 (1972)). Given this history, plaintiffs' right not to be subjected to viewpoint discrimination while speaking in a university's limited public forum was thus clearly established at the times in question.

Because defendants violated plaintiffs' clearly established First Amendment rights, the district court did not err by denying qualified immunity to defendants and granting plaintiffs summary judgment on their First Amendment claims.

IV.

Defendants argue that the injunctive relief granted by the district court is too broad because it grants NORML ISU the ability to use its trademarks in a way that violates its viewpoint neutral trademark guidelines. We review a challenge to a "district court's issuance of a permanent injunction for abuse of discretion." Randolph v. Rodgers, 170 F.3d 850, 856 (8th Cir. 1999). An injunction must not be "broader than necessary to remedy the underlying wrong." Coca-Cola Co. v. Purdy, 382 F.3d 774, 790 (8th Cir. 2004). As noted above, NORML ISU's use of the cannabis leaf does not violate ISU's trademark policies because the organization advocates for reform to marijuana laws, not the illegal use of marijuana. The district court's injunctive order therefore is not an abuse of discretion.

V.

For these reasons, we affirm the judgment of the district court.

KELLY, Circuit Judge, concurring.

I join the court's well-reasoned opinion in full, but write separately to respond to the dissenting opinion.

## A.

Qualified immunity "'does not require a case directly on point' for a right to be clearly established," White, 137 S. Ct. at 551 (alterations omitted) (quoting Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)), nor does it require that "the very action in question has previously been held unlawful," Hope v. Pelzer, 536 U.S. 730, 739 (2002). Rather, "'[t]he salient question is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged conduct was unconstitutional.'" Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (per curiam) (alterations omitted) (quoting Hope, 536 U.S. at 741). The same standard applies to university officials in cases involving the First Amendment. See, e.g., Putnam v. Keller, 332 F.3d 541, 549 (8th Cir. 2003) (denying qualified immunity to public college administrators for violations of former instructor's First Amendment rights); Burnham v. Ianni, 119 F.3d 668, 676–77 (8th Cir. 1997) (en banc) (rejecting university chancellor's claim that the law was not clearly established where "the suppression [of speech] was unreasonable both in light of the purpose served by the forum and because of its viewpoint-based discrimination").

The entitlement to qualified immunity is judged based on the law at the time that a public official makes his or her decision and does not take into account later changes in the law. See Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014); al-Kidd,

-18-

563 U.S. at 741 (determining whether "existing precedent" clearly established the right "at the time of the challenged conduct"); Wilson v. Layne, 526 U.S. 603, 617 (1999) (examining "cases of controlling authority in their jurisdiction at the time of the incident"). At the time of the challenged actions in fall 2012, the defendants were on notice of several cases that clearly established that their conduct violated plaintiffs' First Amendment rights. In at least four cases, the Supreme Court has held that a university creates a limited public forum when it distributes benefits to recognized student groups. See Martinez, 561 U.S. at 685 ("[A] university generally may not withhold benefits from student groups because of their . . . outlook.") (citing Rosenberger, 515 U.S. at 841 (provision of funds from student activities fee); Widmar, 454 U.S. at 269 (holding meetings in university facilities); Healy, 408 U.S. at 181–82 (use of campus bulletin boards, school newspaper, and campus meeting space)); see also Gohn, 850 F.2d at 362 (dissemination of project-based university funds). In every case, the Court held that the university must accord the benefits associated with recognized student group status in a viewpoint neutral manner. See Martinez, 561 U.S. at 686 ("In all three cases[, Rosenberger, Widmar, and Healy,] we ruled that student groups had been unconstitutionally singled out because of their points of view. 'Once it has opened a limited [public] forum, . . . [t]he State may not . . . discriminate against speech on the basis of . . . viewpoint.'" (second and final alterations in original) (quoting Rosenberger, 515 U.S. at 829)).

Here, it is undisputed that ISU granted recognized status to NORML ISU as a student organization. In accordance with the Student Organization Recognition Policy, to achieve recognized status, ISU concluded that NORML ISU's purpose was "consistent with the broad educational mission of the university," but it made clear that it "does not support or endorse the purposes" of any registered organizations, including NORML ISU. The Policy further provides that "recognized organizations are accorded special privileges and benefits," including the ability to use the University's name and marks in accordance with the Trademark Guidelines. Like the opportunity to request funds from the student activities fund in Rosenberger or the

availability of campus meeting space in Widmar, ISU's decision to grant recognized organizations "the privilege of using [ISU's] marks" created a limited public forum, and ISU cannot accord that privilege on the basis of the organization's viewpoint. See Gohn, 850 F.2d at 362 ("The University need not supply funds to student organizations; but once having decided to do so, it is bound by the First Amendment to act without regard to the content of the ideas being expressed."); see also Schiff v. Williams, 519 F.2d 257, 261 (5th Cir. 1975) ("[University] President Williams cannot avoid responsibility for his abridgment of First Amendment rights because his motives were to serve the best interest of the school.").

These factually analogous precedents are no less apposite simply because the court cites no case addressing a trademark licensing program. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope, 536 U.S. at 741. The dissent highlights the fact that the trademark program allowed student groups to place ISU's symbols "side-by-side with a student organization's message." This was also the case in Rosenberger, where the name of the religious group petitioning for funds included the university's name in the title of its publication, 515 U.S. at 826, and in Martinez, where the law school allowed officially recognized groups to use its name and logo, 561 U.S. at 670. These facts did not affect the Court's application of forum analysis in those cases. Cf. Rosenberger, 515 U.S. at 832 (concluding that the university could not "escape the consequences" of the court's prior prohibition on viewpoint discrimination by arguing that "this case involves the provision of funds rather than access to facilities"). These cases clearly established that ISU created a limited public forum and that viewpoint discrimination is prohibited in such a forum.[2]

---

[2]Even if the trademark licensing program were a nonpublic forum, it was clearly established by fall 2012 that viewpoint discrimination was equally prohibited in such a forum. See Child Evangelism Fellowship of Minnesota v. Minneapolis Special Sch. Dist. No. 1, 690 F.3d 996, 1001 n.1 (8th Cir. 2012) ("[B]ecause the district's exclusion of CEF from the after-school program is viewpoint-based, there is no need

**B.**

Adopting ISU's argument, the dissent posits that it is not clearly established that ISU's policy[3] of permitting student organizations to use the University's marks is not government speech. At the time of the challenged conduct, defendants could have been aware of only two of the government speech cases cited by the dissent, as the rest post-date the events at issue by several years. See Mitchell v. Forsyth, 472 U.S. 511, 535 (1985) ("The decisive fact is . . . that the question was open at the time he acted."). With respect to those two cases, it is hard to see how Summum, 555 U.S. at 464, a case concerning the private donation of monuments to a public park, or Knights of Ku Klux Klan v. Curators of Univ. of Missouri, 203 F.3d 1085, 1093 (8th Cir. 2000), a case concerning the "very different context of public television broadcasting," could have disrupted the well-established Supreme Court precedent holding that a university's dissemination of benefits to student groups is not government speech.

Rosenberger rejected an argument indistinguishable from that offered by ISU to support its actions. There, the university argued that it was entitled to decide whether to pay printing costs on behalf of student publications based on the

---

to analyze the nature of the forum of the after-school program . . . . Even in a nonpublic forum, restrictions must be viewpoint neutral."); Burnham, 119 F.3d at 675 ("[T]he nature of the forum makes little difference" in the qualified immunity analysis because "viewpoint-based discrimination" is impermissible in all forums).

[3]The dissent avers that "ISU's general licensing requirements" state that ISU would not approve "products considered dangerous or offensive," including "products causing potential health risks, promoting firearms, drugs, alcohol, gaming or tobacco." Even if this prohibition on certain products applied to the t-shirts at issue, the policy from which the dissent quotes appears to apply only to "external and/or commercial uses of the Marks," which is not applicable to the student organization here.

publications' religious perspective. 515 U.S. at 833–35. The Court rejected this argument, explaining that viewpoint discrimination is improper "when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." Id. at 834. It was evident to the Court that there was a "distinction between the University's own favored message and the private speech of students" because the university disclaimed any control over the student group or any approval of the "organizations' goals or activities." Id. at 824, 834–35.

The resemblance to the present case is striking. Similar to the policy in Rosenberger, the Student Organization Recognition Policy provides that the mission of ISU's student organization program is, in part, to "increase and support diversity in the university community" because "[d]iversity enlivens the exchange of ideas, broadens scholarship, and prepares students for lifelong, productive participation in society." It further states that even though ISU may recognize a student group, it "does not support or endorse the purposes" of any registered student organizations. Three of the defendants unequivocally testified that a student organization's use of an ISU mark does not indicate that the university endorses or supports the organization's message. In a further act of separation, the Trademark Guidelines require language or design details "to show how an Organization is connected to the University," such as "the verbiage 'club,' 'student chapter', or other nomenclature." Furthermore, by permitting a vast number of student groups to promote their own contradictory messages using the university's name and marks, ISU continues a long university tradition of fostering the diverse viewpoints of its student body, not communicating a message from the university. See id. at 835–36; id. at 850 (O'Connor, J., concurring); Martinez, 561 U.S. at 704–05 (Kennedy, J., concurring) ("Extracurricular activities . . . facilitate interactions between students, enabling them to explore new points of view, to develop interests and talents, and to nurture a growing sense of self. . . . A law school furthers these objectives by allowing broad diversity in registered student organizations." (internal citations omitted)); Bd. of Regents v. Southworth,

-22-

529 U.S. 217, 229 (2000) (expressive activities undertaken by registered student organizations "spring[] from the initiative of the students, who alone give [them] purpose and content in the course of their extracurricular endeavors"). Given the undisputed facts and their placement in the university context, any purported concern that ISU's message "would be attributed to the University is not a plausible fear." Rosenberger, 515 U.S. at 841. Defendants were not entitled to rely on the government speech doctrine where no one would "routinely—and reasonably—interpret" ISU's name and mark on a student organization t-shirt as the university's expressive conduct. Summum, 555 U.S. at 471.

The dissent's contention that the government speech issue warrants qualified immunity appears to be based in large part on defendants' actions in response to NORML ISU and to the "widespread adverse public reaction to the Register article."[4] I can find no court that has examined the government speech issue so narrowly. Instead, we must look at the nature of the government program or policy. See Summum, 555 U.S. at 467 ("The parties' fundamental disagreement thus centers on the nature of petitioners' conduct when they permitted privately donated monuments to be erected in Pioneer Park. Were petitioners engaging in their own expressive conduct? Or were they providing a forum for private speech?"); Knights of Ku Klux Klan, 203 F.3d at 1093 (examining "the central purpose of the enhanced underwriting program"). The question here is not whether NORML ISU or the public's actions justified ISU's response, but rather whether ISU's program of permitting student organizations to use the ISU name and marks constitutes ISU's "own expressive conduct." Summum, 555 U.S. at 467. As discussed above, the defendants, the university, and the public do not "often closely identif[y]" student organization t-shirts bearing ISU marks with the expressive conduct of the university. Id. at 472. In fact, as the court aptly notes, the only time any purported confusion arose regarding the

_____

[4]Aside from contacts from government officials, the record contains evidence of only three comments directed at ISU from parents of former or current students regarding the NORML ISU t-shirt.

-23-

appearance of University endorsement for a message on a student organization t-shirt was in the present case. Cf. Bd. of Educ. v. Mergens By & Through Mergens, 496 U.S. 226, 250 (1990) (plurality op.) ("We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis. The proposition that schools do not endorse everything they fail to censor is not complicated." (internal citations omitted)). No reasonable university official could have relied on this single example of confusion, in a field of at least 2,195 student organization uses of ISU marks, to convert a historic forum for student speech into government speech.[5]

## C.

The dissent ultimately acknowledges that "ISU created a limited public forum when it licensed hundreds of student organizations to use ISU's trademarks to enhance the students' public speech." However, it declines to accept the detailed and rigorous findings of the district court that clearly demonstrated that ISU engaged in impermissible viewpoint discrimination. Instead, the dissent contends—despite the argument not being raised by ISU—that the university engaged in permissible content regulation.

Even if defendants had raised the defense of content regulation in the manner presented by the dissent, this theory would not entitle defendants to qualified immunity. In a limited public forum, the state may "confin[e] the forum to the limited and legitimate purposes for which it was created" by "reserving it for certain groups

---

[5]Compared to the long history of the First Amendment, the government speech doctrine may be considered "recently minted," Summum, 555 U.S. at 481 (Stevens, J., concurring), or "relatively new," Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 574 (2005) (Souter, J., dissenting), but it dates back at least to 1991, see Summum, 555 U.S. at 481 (Stevens, J., concurring) (citing Rust v. Sullivan, 500 U.S. 173 (1991)), long before the speech at issue here.

or for the discussion of certain topics." Rosenberger, 515 U.S. at 829. But there are "constitutional constraints on the boundaries the State may set:" It "'may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, . . . nor may it discriminate against speech on the basis of . . . viewpoint.'" Martinez, 561 U.S. at 685 (alterations in original) (quoting Rosenberger, 515 U.S. at 829). Assuming the dissent's purported purpose for the forum—"to protect and promote ISU's public image"—were the one the defendants would advocate,[6] the rationales offered for excluding NORML ISU from the forum are not reasonable or viewpoint-neutral.

First, the dissent suggests that NORML ISU was targeted because its t-shirt conveyed the "perception that ISU endorses the message." If that were the rationale, ISU presumably would have rejected the design in the first instance. It did not do so. Instead, ISU approved the design, never mentioning any concern that the t-shirt conveyed the perception of university endorsement. With ISU's approval, the t-shirts were made, distributed, and worn by NORML ISU members. Only when NORML ISU and the t-shirts received news coverage did ISU act. "Participants in a [limited public] forum, declared open to speech *ex ante*, may not be censored *ex post* when the sponsor decides that particular speech is unwelcome." Hosty v. Carter, 412 F.3d 731, 737 (7th Cir. 2005). No reasonable university official could have believed that post facto closing a forum that was previously open was a permissible exercise of content discrimination.

"The existence of reasonable grounds for limiting access to a nonpublic forum . . . will not save a regulation that is in reality a facade for viewpoint-based discrimination." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 811 (1985). The facade is evident here: ISU did not uniformly bar student groups

_____

[6]In its briefing, ISU stated that the purpose of its trademark program was to "reflect[] the University's rightful commitment to fostering diverse forms of civic engagement and intellectual exploration and debate."

from using its marks when the product "convey[ed] the perception that ISU endorse[d] the message." For example, ISU approved a t-shirt which included "Just Proud" on the front and "ISU LGBTA Alliance" on the back; a vinyl banner that said "ISU Tea Party" with the ISU mascot holding a Tea Party flag; a t-shirt with the ISU Cuffs[7] logo including a pair of handcuffs on the front and a message stating "Play Hard" on the back; and a banner that stated "Choose Peace Choose Life!" sponsored by the "Students for Life Club at Iowa State University." ISU's decision to permit these groups to use ISU marks but to deny NORML ISU's t-shirt submissions was not reasonably based on a distinction in the perception of university endorsement. "From no other group does [ISU] require the sterility of speech that it demands of [NORML ISU]. . . . This is blatant viewpoint discrimination." Good News Club v. Milford Cent. Sch., 533 U.S. 98, 124 (2001) (Scalia, J., concurring); see Stanley v. Magrath, 719 F.2d 279, 284 (8th Cir. 1983) (concluding that the defendants' decision to reduce a student newspaper's funding was improperly motivated by the content of an issue because "[i]f the Regents had truly been motivated by [a viewpoint neutral justification], then one would expect that they would have taken some action in regard to the newspapers at the other campuses").

ISU's alleged concern that the public would perceive endorsement was limited to one group whose message it disagreed with. Since at least 1972, it has been clearly established that "[t]he College, acting here as the instrumentality of the State, may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent." Healy, 408 U.S. at 187–88. Rather than revoke NORML ISU's permission and subject it to unique scrutiny, "the school's adherence to a rule of viewpoint neutrality in administering its [trademark] program would prevent 'any mistaken impression that [NORML ISU] speak[s] for the University.'" Southworth,

[7]Cuffs is a registered student group at ISU organized around alternative sexual practices such as kink, fetish, and BDSM.

529 U.S. at 233 (quoting <u>Rosenberger</u>, 515 U.S. at 841). Defendants failure to follow this clearly established rule makes qualified immunity inappropriate.[8]

Second, the dissent contends that ISU could have reasonably denied NORML ISU's t-shirt design because it "appear[ed] to link ISU to unsafe or illegal activities such as illegal drug use." Assuming such a restriction on a limited public forum is proper, ISU had no such provision in its Trademark Guidelines, nor did it rely on this rationale when it rejected NORML ISU's reorder of T-Shirt Design #1. The court cannot grant defendants qualified immunity based on a forum limitation they did not assert. Nor is such a limitation supported by our case law. No court of appeals has applied <u>Morse v. Frederick</u>, 551 U.S. 393 (2007) in a university setting. And, Justice Alito's controlling concurrence states that the case "provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue, including speech on issues such as the wisdom of the war on drugs or of legalizing marijuana for medicinal use." <u>Id.</u> at 422 (Alito, J., concurring) (internal quotation marks omitted). Defendants, and even the dissent, acknowledge that T-Shirt Design #1 conveyed NORML ISU's support for the legalization of marijuana, making <u>Morse</u> inapplicable. Even if NORML ISU did advocate illegal drug use, defendants were on notice that student organization "speech about an illegal activity would still be protected by the First Amendment." <u>Gohn</u>, 850 F.2d at 368 (rejecting the

---

[8]The dissent's reliance on <u>Hazelwood Sch. Dist. v. Kuhlmeier</u>, 484 U.S. 260 (1988) is misplaced. That case concerned whether "educators may exercise editorial control over the contents of a high school newspaper produced as part of the school's journalism curriculum." <u>Id.</u> at 262. Setting aside whether the case is applicable in the university context, <u>see</u> <u>McCauley v. Univ. of the Virgin Islands</u>, 618 F.3d 232, 242–47 (3d Cir. 2010), it expressly limited its holding to activities "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." <u>Hazelwood</u>, 484 U.S. at 271. Because neither of these elements are present here, no reasonable university official would have relied on <u>Hazelwood</u> in the present case.

university's argument that it could refuse to fund a gay and lesbian student group because "sodomy is illegal in Arkansas").

The district court properly denied the defendants qualified immunity.

LOKEN, Circuit Judge, dissenting.

This is a difficult case raising important First Amendment issues. I agree with the district court that Iowa State University administrators over-reacted to a publicly sensitive situation, warranting injunctive relief, though I would not affirm the court's permanent injunction as worded.[9] I write separately to dissent from our court's decision to deny the individual Defendants qualified immunity from the Plaintiffs' claims for compensatory damages and attorneys' fees.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Sutton v. Bailey, 702 F.3d 444, 449 (8th Cir. 2012), quoting Messerschmidt v. Millender, 565 U.S. 535, 546 (2012). In my view, the ISU administrators were neither plainly incompetent nor knowing lawbreakers. "Many aspects of the law with respect to students' speech . . . are difficult to understand and apply . . . . Public officials need not predict, at their financial peril, how constitutional uncertainties will be resolved." Hosty v. Carter, 412 F.3d 731, 739 (7th Cir. 2005) (en banc), cert. denied, 546 U.S. 1169 (2006).

---

[9]The court permanently enjoined Defendants "from enforcing trademark licensing policies against Plaintiffs in a viewpoint discriminatory manner and from further prohibiting Plaintiffs from producing licensed apparel on the basis that their designs include the image of a similar cannabis leaf." As I will explain, the term "viewpoint discriminatory" is too vague to satisfy Fed. R. Civ. P. 65(d), and compelling Defendants to approve any design with a cannabis leaf is overbroad.

A public official is entitled to qualified immunity if his or her conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quotation omitted). The court denies the Defendants qualified immunity, concluding it was clearly established at the time in question (i) "that ISU's trademark licensing program was a limited public forum," (ii) that Defendants engaged in viewpoint discrimination (a conclusion requiring a determination of purpose or motive the court makes based on inferences drawn from a summary judgment record), and (iii) "that a university may not discriminate on the basis of viewpoint in a limited public forum."

Repeatedly, the Supreme Court has cautioned that "clearly established law should not be defined at a high level of generality." White v. Pauly, 137 S. Ct. 548, 552 (2017) (quotations omitted). Rather, "clearly established law must be particularized to the facts of the case." Id. (quotation omitted). In a public school or university setting, "educators are rarely denied immunity from liability arising out of First-Amendment disputes. The rare exceptions involve scenarios in which a factually analogous precedent clearly established the disputed conduct as unconstitutional." Morgan v. Swanson, 755 F.3d 757, 760 (5th Cir. 2014) (citation omitted); cf. Wilson v. Layne, 526 U.S. 603, 618 (1999); Keefe v. Adams, 840 F.3d 523, 541 (8th Cir. 2016) (Kelly, J. concurring), cert. denied, 2017 WL 843965 (2017). The court cites no case in which school officials administering a trademark licensing program violated, or were even accused of violating, the First Amendment by denying proposed uses of the school's registered trademark.

This case presents two uncertain First Amendment issues that warrant qualified immunity: (1) whether a trademark licensing program that allows student groups to associate their messages with the university's symbol or logo is a form of government speech or a limited public forum; and (2) if the program is a limited public forum, whether administrators' decisions to restrict the licensing of designs associating the

university with unsafe or illegal activities such as drug use constitute unlawful viewpoint discrimination or permissible content regulation.

**A.** Long before ISU rejected a NORML ISU design, its trademark licensing program guidelines stated that the program exists to promote ISU to the public, because ISU "benefits from public recognition of its names, symbols, logos, and other identifying marks." The program's restrictions were necessary to "promote and protect the university's image." Student organizations using the marks must adhere to ISU-drafted design standards -- each design must state the recognized name of the student organization; use high quality imaging and colors from the ISU official color palette; and avoid vulgar language, profanity, or words with inappropriate double meanings. Multiple guideline provisions warn of the need to avoid "the appearance of a University endorsement." ISU's general licensing requirements stated: "No products considered dangerous or offensive will be approved, including but not limited to products causing potential health risks, promoting firearms, drugs, alcohol, gaming, or tobacco."

Based on these undisputed program policies, it was far from clear prior to this litigation that ISU's trademark licensing program was *not* a form of government speech. If it was government speech, "the Free Speech Clause has no application." Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467 (2009). The Court in Summum recognized that "[t]here may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech." Id. at 470. The majority brushes this issue aside, concluding it "was clearly established . . . that the government speech doctrine does not insulate a state actor from First Amendment scrutiny when the state has created a limited public forum for speech." *Ante* at 16. But this simply begs the question. When the government speaks, "forum analysis is misplaced." Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2250 (2015).

At the time in question, the Supreme Court had decided <u>Summum</u>, holding that privately donated monuments displayed on public property were a form of government speech. 555 U.S. at 481. Our court had held that a university radio station's decision not to air an acknowledgment of a Ku Klux Klan contribution was government speech, even though the station accepted and acknowledged contributions from a diverse array of groups. <u>Knights of Ku Klux Klan v. Curators of Univ. of Mo.</u>, 203 F.3d 1085, 1095 (8th Cir.), <u>cert. denied</u>, 531 U.S. 814 (2000). More recently, the interpretation of government speech has broadened. In 2015, a divided Supreme Court extended the doctrine to Texas's decision to exclude from its specialty license plate program a design proposed by the Sons of Confederate Veterans. The majority reasoned that "[t]he governmental nature of the plates is clear from their faces," and "a person who displays a message on a Texas license plate likely intends to convey to the public that the State has endorsed that message." <u>Walker</u>, 135 S. Ct. at 2248-49.[10] That same year, the Eleventh Circuit concluded that private advertising banners printed in school colors, subject to school design requirements, and displayed on school fences were government speech because "observers reasonably believe the government has endorsed the message." <u>Mech v. Sch. Bd. of Palm Beach Cty., Fla.</u>, 806 F.3d 1070, 1076-77 (11th Cir. 2015), <u>cert. denied</u>, 137 S. Ct. 73 (2016).

Here, Defendants' actions were based on their concern that NORML was trading on the notion that use of ISU's trademark reflected university support. Indeed, the dispute was triggered when NORML's President bragged in the <u>Des Moines Register</u> that the trademark licensing approvals reflected "nothing but support from the university," support for the group that was "blowing our minds." The court asserts that Defendants then reacted to a "political controversy" after inquiries from "the governor's office and an Iowa House Republican Caucus staff person." *Ante* at 11. But the record reflects widespread adverse public reaction to the <u>Register</u> article,

---

[10]Plaintiff Erin Furleigh confirmed this obvious point, admitting that NORML ISU wanted to use Cy the Cardinal on the group's t-shirts because "you see Cy and you think Iowa State. It's not just NORML, it's Iowa State."

including one parent of an ISU student who worried that, if Cy "becomes a role model for drug use," will public school anti-drug programs need to "teach, 'just say no to Cy'"?  On this record, the government speech issue is far more difficult than the court posits; at a minimum, it warrants qualified immunity because the issue is clearly not "beyond debate."  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011); see, e.g., Summum, 555 U.S. at 481 (Stevens, J., concurring) (government speech is "recently minted"); Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 574 (2005) (Souter, J., dissenting) ("The government-speech doctrine is relatively new, and correspondingly imprecise."); Mech, 806 F.3d at 1074 ("The Supreme Court has not articulated a precise test for separating government speech from private speech.").

**B.**  In concluding that ISU's trademark licensing program is a limited public forum, the court relies primarily on Rosenberger v. University of Virginia, 515 U.S. 819 (1995), which held that a public university violated the First Amendment when it excluded all religious groups from a program that widely distributed funds for printing student publications.  While Rosenberger is clearly relevant, it does not definitively answer whether the ISU trademark program created a limited public forum, and if so, the extent to which the First Amendment limits administration of that program.  Like the funding program in Rosenberger, the trademark program was open to a wide variety of student groups.  But unlike a program that simply funds student activities, the trademark program allowed student groups to place ISU's most prominent public symbol side-by-side with a student organization's message, sometimes, as in this case, leading the public to believe that ISU endorsed the message, no matter how hard ISU attempted to counter that assumption.

"A limited public forum, like a nonpublic forum, may be 'limited to use by certain groups or dedicated solely to the discussion of certain subjects,' and the public entity 'may impose restrictions on speech that are reasonable and viewpoint-neutral.'" Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist., 640 F.3d 329, 334-35 (8th Cir.) (citation omitted), cert. denied, 565 U.S. 1036 (2011).  In

determining whether a public university is "confining a [limited public] forum to the limited and legitimate purposes for which it was created" in a viewpoint-neutral manner, courts must distinguish "between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations." Rosenberger, 515 U.S. at 829-30. Content regulation permits the school to "reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983). In denying the individual Defendants qualified immunity, the court ignores this critical distinction.

In the public school or university setting, a limited public forum is not created absent "clear intent to create a public forum." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 271 (1988). Though there is no analogous precedent, I agree ISU created a limited public forum when it licensed hundreds of student organizations to use ISU's trademarks to enhance the students' public speech. But one of ISU's central purposes was to protect and promote ISU's public image, and the program guidelines explicitly "reserve[d] the forum" for this purpose. Id. at 270. A limited public forum created for this purpose may reasonably deny access to uses that convey the perception that ISU endorses the message -- which NORML publicly conveyed -- or that appear to link ISU to unsafe or illegal activities such as illegal drug use.

Speech restrictions of this kind are permissible content regulation so long as they are "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Perry, 460 U.S. at 46. And it is not sufficient to assume, as the court does, that Defendants were guilty of viewpoint discrimination, as opposed to content regulation, because they scrutinized NORML ISU's message

more rigorously than those of the ISU hockey club and other groups.[11] "The question whether the First Amendment requires a school to tolerate particular student speech . . . is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech." Hazelwood, 484 U.S. at 270-71.

This case raises serious issues that both the district court and our court do not adequately analyze. First, even if NORML ISU's primary purpose was law reform, many of the designs Defendants rejected could "reasonably [be] viewed as promoting illegal drug use." Morse v. Frederick, 551 U.S. 393, 403 (2007). For example, T-Shirt Design # 1 had the words "Freedom is NORML at ISU" next to an image of a cannabis leaf; another design showed the ISU mascot next to the text: "NORML: It's Not For Everyone But It's Not a Crime."[12] In Morse, the Supreme Court held, without forum analysis, that a school principal did not violate the First Amendment when she confiscated a student banner reading "BONG HiTS 4 JESUS" because "the sign advocated the use of illegal drugs." Id. at 402. Second, even if Defendants acted because NORML was using ISU's trademark to advocate controversial law reform, rather than because NORML was promoting illegal drug use, does the First Amendment require that administrators of a limited public forum created to promote a public university permit participation by those advocating law reform, when there are many other avenues of speech open to student advocates? Third, what specific student uses of *this* limited public forum must be approved because rejection would not be reasonable, therefore permissible content regulation? Surely not every picture of a cannabis leaf with Cy must be approved. In my view, these difficult and complex issues make clear why the individual Defendants are entitled to qualified immunity.

---

[11]The record reflects that from December 2007 to March 2015, the Trademark Licensing Office received 4,167 student organization submissions; 710 were rejected, 1,139 were approved subject to revision, and 2,195 were approved.

[12]Rejecting this latter design, the Trademark Office wrote: "I would suggest you use a statement in line with your mission (working to reform marijuana laws)."

For the foregoing reasons, I respectfully dissent.

_____